## Court of Appeals.

*October,* 1883.

## PEOPLE *v.* HOVEY.

(Affirming 1 *N. Y. Crim. Rep.* 324.)

NEWLY DISCOVERED EVIDENCE—WHEN NOT GROUND FOR
NEW TRIAL.—APPEAL FROM ORDER DENYING
MOTION FOR NEW TRIAL.

After a judgment of conviction of murder in the first degree, a motion
was made for a new trial on the ground of newly discovered evidence,
which evidence was in substance set forth in the affidavit of a
physician, stating that he had seen the prisoner the day after the
homicide; that at that time the prisoner was oblivious of what had
occurred for a week before; and that he had ascertained that the
prisoner was accustomed to the use of opiates. *Held,* that this
evidence is only material as it bears upon the criminal responsibility
of the prisoner; that its bearing upon that point is to be deemed
remote; and that such want of consciousness of the prisoner on the
morning after the homicide may be consistent with the possession of
his faculties at the time of its commission.

Further *held,* upon consideration of the evidence, etc., that the General
Term was correct in holding that this was not a case for the inter-
vention of the court in granting a new trial.

RAPALLO, MILLER, and FINCH, JJ., dissented.

Whether an appeal lies to this court from an order denying a motion for
a new trial in a criminal case made after conviction and judgment,
on the ground of newly discovered evidence, *quære.*

Appeal from an order of the General Term of the Supreme
Court, First Department, affirming an order made by Hon.
CHARLES DONOHUE, and entered July 19, 1883, denying a
motion for a new trial upon the ground of newly discovered
evidence.

Defendant was tried and convicted of homicide in the Court
of General Sessions of New York County; an appeal was taken

to the General Term and the judgment affirmed (*ante*, p. 180), after which an appeal was taken to this court, and the judgment finally affirmed (*ante*, p. 282). An application was made for a new trial upon the ground of newly discovered evidence, and this motion was denied, whereupon an appeal was taken to the General Term and the order denying the motion was there affirmed (*ante*, p. 324), and this appeal from such order of affirmance was then taken to this court.

The facts appear in the opinions.

PER CURIAM.—In view of the grave interest involved in this case, we have examined the facts presented in the papers on which the application for a new trial was made, without considering or passing upon the question whether an appeal lies to this court, from an order denying a motion for a new trial, in a criminal case, made after conviction and judgment, on the ground of newly discovered evidence.

The newly discovered evidence is in substance, set forth in the affidavit of the physician who saw the prisoner on the day following the homicide at the prison. The physician, in substance, states at that time the prisoner was oblivious of what had occurred for a week before. He further states that he ascertained that the prisoner was accustomed to the use of opiates and sedatives of various kinds. This evidence is only material as it bears upon the criminal responsibility of the prisoner at the time of the homicide; but it is apparent that its bearing upon the point, to say the most, is quite remote. The want of consciousness of the prisoner, on the morning after the homicide, of his acts for a week before, may be quite consistent with the possession of his faculties at the time. It does not appear that he was not, when the examination was made, under the immediate influence of drugs, taken after the homicide; that his condition observed by the physician was not attributable to that cause.

The facts found on the trial tend to show that the homicide was the willful, conscious, and deliberate act of the prisoner. The prisoner was sworn on the trial, and while professing to recollect the whole occurrence, attributed the homicide to acci-

dent. It is not proposed to show, by any acquaintance of the prisoner, that before the homicide he was not in possession of his reason and accountable for his acts. It may be inferred that he was accustomed, to some extent, to the use of intoxicating drink, but nothing was proved on that trial from which a just inference could be drawn at that the time of the homicide his power of will or deliberation was affected or weakened by this cause.

It is doubtless true that no adequate motive for the homicide was shown, but this is by no means an unusual fact in criminal cases.

The General Term has carefully considered the case, and we are constrained to concur in the conclusion reached, that a case is not made for the intervention of the court in granting a new trial.

The order affirming the order denying the motion is affirmed.

RAPALLO, J. (Dissenting).—The evidence which the prisoner's counsel seek to introduce, is not claimed to establish a defense to the charge of homicide, but simply to bear upon the question of the degree of his crime; that is, whether it was committed with the deliberate and premeditated design which the statute requires to justify the infliction of the penalty of death.

The case presents many singular features. In the first place it is conceded by a majority of my brethren, that no adequate motive appears for the commission of the crime. The prisoner and the deceased were on friendly terms. She was his wife's sister, and was a young married woman about nineteen years of age, who with her husband lived with the prisoner and his wife. As the sister of the deceased testified, the deceased had always been very kind to the prisoner, and the prisoner testified that he regarded her as his best friend. They lived on the second floor, the prisoner and his wife occupying the front hall bedroom, and the deceased and her husband occupying the back bedroom on the same floor, there being a middle room between, which was occupied by a different family. No eye-witness of the homicide was examined. One of the strong points made against

the prisoner is, that although his wife was present, her testimony was excluded on the objection of the prisoner's counsel.

The prisoner appears to have been a worthless character, who had been three times in prison for stealing, and he was defended by counsel assigned to him by the court. The testimony on the part of the prosecution was very brief. The leading facts proved, immediately relating to the killing, were, that on the morning of the 26th of April, 1882, he went out between eight and nine o'clock, after breakfast. He returned to dinner between twelve and one, went out again about two, and returned at six in the evening, when he went into the room of deceased, where his wife also was, and a few moments after he entered, the deceased, accompanied by prisoner's wife, ran out of the room, vomiting blood and calling for help, and ran down stairs to the room of Mrs. Byrnes, who occupied a store and back room on the first floor, where she died, having been shot through the heart. After the shooting, and after deceased had run down stairs, the prisoner stood outside of the door of the room of deceased, where the shooting had taken place, and Miss McCullough, another sister of deceased, testified that she asked him what he had done, and he said, "Nothing." He still held in his hand the pistol with which deceased had been shot. He was then about to sit down in the room of deceased, when the witness ordered him out, and he then went across the hall to his own room, where his baby was lying ill. Witness told him not to touch the baby, when with an opprobrious epithet he ordered her out of that room, threatening that if she did not go he would kill her too. He then hid himself under the bed, where he was soon after arrested, his pistol being found lying on the floor.

The officer who arrested him took him down stairs to the room where deceased was dying, and being told to look at what he had done, he laughed.

He admitted he had killed deceased with the pistol shown him, but on the trial he testified that the killing was accidental.

The only provocation shown was that in the morning, before he went out, he asked his wife to wash his feet, and the deceased interposed, telling him that he ought to think more of his dying baby, to which he replied, " You are getting

too God-damned high-toned." The sister of deceased who testified to this, stated that these are the only angry words she ever heard pass between them.

The facts bearing upon the question of deliberation and premeditation were, that the prisoner had always been in the habit of carrying a pistol, which he was accustomed to give the deceased to keep for him when he came home at night. The night before the homicide, she had put the pistol away, and in the morning her brother, William McCullough, took it from the place where she had concealed it, and took it away from the house. On the day of the homicide, being without a pistol, he pawned his coat and bought another, and the theory of the prosecution is, that this was done with the intention of killing the deceased. On the other hand, the father and sister of the prisoner, who were the only witnesses called in his behalf, testified that it had been his habit from boyhood always to carry a pistol, and if it was taken away from him, immediately to procure another. His habit of always carrying a pistol was corroborated by Miss McCullough.

Rude language, indicative of a violent disposition, addressed after his arrest to Mrs. Byrnes, to the officer who arrested him, and to the sergeant of police, was testified to on the trial, and was denied or explained by the prisoner. The only witnesses called in his behalf were himself, his father, and his sister. The sole defense set up was that the pistol was accidentally discharged while taking it out of his pocket, when he came home in the evening. There was no evidence tending to show that he was not in the full possession of his faculties and fully conscious of all that he was doing, and capable of forming and carrying out the deliberate plan imputed to him, or that his actions should not be judged by the same rules and standard which would ordinarily be applied to a sober, cool man, free from all influence affecting his judgment and reasoning powers. Mrs. Byrnes testified that he was perfectly sober. Mr. Bryte said that he would not swear that the prisoner had been drinking, but thought he had, and should say he had been imbibing slightly. Miss McCullough said she noticed no effects of liquor upon him. The case presented before the jury by the witnesses for the prosecution was therefore that of a sober man

in the full exercise of his mental powers. Notwithstanding the singularity of his actions, the monstrosity of his deliberately forming a plan to kill a young woman with whom he always had been on friendly terms, without any provocation except the few words that have been detailed, the fact that after that occurrence he had been home to dinner, when no quarrel or anger seems to have been manifested, his attempting at first to remain in the very room where he had committed the homicide, and when ordered out of that, instead of leaving the house and endeavoring to escape, childishly attempting to conceal himself by hiding under the bed in his own room in the presence of the sister of the deceased, leaving his pistol beside him on the floor, laughing when his deadly work was exhibited to him ; notwithstanding all these extraordinary actions, there was absolutely nothing in the evidence before the jury which authorized them to infer that they could be attributed to anything but depravity and natural malignity, and the jury were reduced to considering whether he told the truth in testifying that the killing was accidental, on which statement he wholly rested his defense, and which, if credited, would have wholly acquitted him.

But if the evidence which his counsel now seek to introduce, had been before the jury, I think it is impossible to say that it would not have created in their minds such a doubt as to the physical condition of the prisoner and the deliberate premeditation of his act, as would have induced them, although they disbelieved his allegation of accident, to find that the homicide was committed on the spur of the moment, from an over-excited brain or a diseased condition of his system, caused by the excessive use of alcohol and opiates. The evidence of his mental condition, as shown by Dr. Hardy in his affidavit, would tend to reconcile many of the incongruities in the testimony. Dr. Hardy examined him in his cell the day after the homicide, when only a night had intervened, and treated him medically for two weeks for nervousness and insomnia produced by the abuse of alcohol and the habit of using opium, chloral, and bromide of potassium, to which he was accustomed, and the deprivation of which rendered him unable to control himself. That he was satisfied that the prisoner had been addicted

for some time to the use of these sedatives, and that the result of his examination, and his opinion as an expert was that the day after the homicide his mind was in such a condition that he was oblivious of his actions during the week previous to that day.

This evidence might well have been considered as bearing upon the condition of his mind on the day of the homicide, for the purpose of determining the degree of his crime.

The objection of the prisoner to the examination of his wife as a witness for the prosecution, does not necessarily imply that her testimony would have tended to show premeditation. The most that could be said is, that he may have apprehended that it would conflict with his defense of accident, on which he depended for full acquittal.

As the objection of laches, Dr. Hardy swears that he communicated the facts which he could prove, for the first time, to the prisoner's counsel, in the prison, on the 27th of June, 1883. The motion was noticed on the 11th of July.

Officer Baker's affidavit shows that on the 15th of April, 1882, shortly before the homicide, the prisoner was arrested for intoxication and committed to prison, where he remained some days and was very violent in his conduct. La Faye, one of the keepers, testified that while in prison he was so violent that it was necessary to confine him with iron handcuffs and a leather belt, to prevent him from doing harm to himself and others. These facts were unknown to the prisoner's counsel until the latter part of June, 1883. It does not appear that even the prisoner himself knew what Dr. Hardy would testify to. He unadvisedly sought to obtain an entire acquittal on the ground of accident, and did not instruct his counsel as to matters which would have conflicted with that defense, and weakened the force of his own testimony, by which alone it was supported; and in a capital case the rule of diligence should not be too strictly applied. The courts, as well as the prisoner, are interested in not inflicting the extreme penalty of the law, unless the facts of the case fully warrant it; and although the matters now sought to be shown, do not shield the prisoner from the consequences of his crime, they might well be considered by

the jury in passing upon the question whether it was committed with deliberation and premeditation.

MILLER and FINCH, JJ., concur.